

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

J.N **FILED**
MAR 3 1 2006
MICHAEL W. DOB-
CLERK ... W. DOB-

| | |
|---|---|
| JONATHAN D. MEYERS, on behalf of himself and all others similarly situated, | 06CV1776 |
| | JUDGE KENNELLY |
| Plaintiff, | MAG. DENLOW |
| -against- | **CLASS ACTION COMPLAINT** |
| NORTHFIELD LABORATORIES, INC. and STEVEN A. GOULD, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, Jonathan D. Meyers, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the public documents filed with the United States Securities and Exchange Commission ("SEC"), United States Food & Drug Administration ("FDA"), press releases, announcements made by the defendants, and other publicly available materials regarding Northfield Laboratories, Inc. ("Northfield" or the "Company"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1. This is a class action brought by plaintiff on behalf of himself and a Class consisting of all other persons who purchased or otherwise acquired Northfield common stock during the period from February 20, 2004 through February 21, 2006, inclusive (the "Class

Period") to recover damages caused by the defendants' violation of federal securities laws. The Company trades its shares on the NASDAQ under the ticker symbol "NFLD". The Complaint alleges that during the Class Period, defendants issued and/or failed to correct false and misleading statements and press releases concerning certain Company drug trials of PolyHeme® ("PolyHeme"), specifically serious adverse events and safety problems which arose during its elective surgery clinical trial (the ANH clinical trial defined in ¶3 below) that was abruptly shut down in 2001.

2. Northfield's future relies on ultimate FDA approval of its sole product, the blood substitute, PolyHeme. PolyHeme is a temporary oxygen-carrying red blood cell substitute made from real blood that has started to break down. PolyHeme requires no cross-matching and is compatible with all blood types. Previous hemoglobin-based blood substitutes have been associated with the narrowing of blood vessels, kidney and liver dysfunction. Currently, Northfield describes itself as the only Company known to be in the final stage clinical trials.

3. Commencing on or about 1997, Northfield conducted a 240-patient Acute Normovolemic Hemodilution (ANH) clinical trial, also known as the Company's abdominal aorta aneurysm trial. Northfield conducted the ANH clinical trial with a protocol that resulted in the PolyHeme patients having 60 percent of their blood volume withdrawn versus 30 percent in the control group. According to *The Wall Street Journal* ("*WSJ*") which published a number of articles concerning Northfield's development of PolyHeme, the ANH clinical trial finished with some worrisome results. According to a *WSJ* article on February 22, 2006, (the "February 22, 2006 *WSJ* article"), ten of 81 patients who received PolyHeme in the ANH clinical trial suffered a heart attack within seven days, and two of those died. None of the 71 patients in the trial who received real blood were found to have had a heart attack. According to the *WSJ*, besides the heart attacks and deaths in those taking PolyHeme, the ANH clinical trial suggested that the

2

product was linked with other serious adverse events such as heart rhythm aberrations and pneumonia. According to the *WSJ*, Northfield ended the ANH clinical trial in 2001 and did not publicly disclose the results. Despite the serious adverse events in the ANH trial, in August 2001, Northfield sought FDA approval to file an application to market PolyHeme. On November 19, 2001 the FDA rejected Northfield's initial application to market PolyHeme.

4. During the Class Period, the defendants never disclosed the full study results or the serious adverse events, which is usually done after the close of a Phase III clinical trial, despite the fact that various clinicians involved in those studies requested the Company publish the results. In the February 22, 2006 *WSJ* article, defendant Gould admitted that, "[W]e did not allocate resources to publication. In retrospect, reporting the full study results earlier would have been better."

5. On February 22, 2006, Northfield's common stock traded as low as $8.86 per share after closing on the previous trading day at $12.23. Over 4 million shares were traded on that day. Northfield's shares continued to trade lower as additional news broke, including the announcement on February 23, 2006, by United States Senator Charles Grassley ("Grassley"), Chairman of the U.S. Senate Finance Committee, than he had begun an inquiry into the PolyHeme matter. Grassley was concerned because under FDA regulations Northfield is allowed to test PolyHeme in the current phase III clinical trial for trauma without obtaining any consent from the trauma patient who often is unconscious. In place of individual patient consent, the medical centers testing PolyHeme are required to carry out community-awareness campaigns about the trials. According to the *WSJ*, several hospitals have told community meetings that previous PolyHeme trials demonstrated the product's safety, failing to mention the adverse results from the ANH clinical trial. On March 16, 2006, the Company disclosed that the SEC commenced an informal investigation.

3

6. During the Class Period, the defendants' scheme operated as a fraud or deceit on purchasers of Northfield's common stock. The defendants engaged in a scheme, conspiracy and course of conduct to conceal and misrepresent the material adverse facts concerning the data and results from the ANH clinical trial of PolyHeme. Defendants made materially false and misleading statements regarding Northfield's ANH clinical trial and the Company's business, and future prospects, as described herein, which caused and maintained the artificial inflation in the Company's shares.

7. The defendants were motivated to not fully disclose the adverse cardiac results of the ANH clinical trial which was eventually shut down in 2001 in order to (i) facilitate the acceptance of local communities and universities to conduct and allow subsequent PolyHeme clinical trials to proceed; (ii) to persuade clinicians and prospective patients to participate in the pivotal Phase III clinical study because there had been no serious adverse events in prior clinical trials; and (iii) continue and enhance the illusion that PolyHeme was a blood substitute with a clean safety profile in order to generate tens of millions of dollars through offerings of Northfield common stock.

8. Statements issued by the defendants during the Class Period were materially false and misleading when made because defendants failed to disclose or indicate that: (a) the Company's ANH clinical trial was abruptly ended due to serious adverse events involving heart attacks and deaths of patients receiving PolyHeme in the study; (b) the Company's potential earnings from PolyHeme had been overstated because of the lack of full disclosure as to the Company's ANH clinical trial's adverse results; (c) defendants had issued false and misleading statements to investors as to the progress of, marketability and ultimate success of PolyHeme; (d) the adverse results of the Company's ANH clinical trial for PolyHeme would subject Northfield to increased regulatory scrutiny and greater risk that the FDA might not approve PolyHeme for

4

marketing; (c) the structure of the Company's PolyHeme drug trials whereby PolyHeme may be tested on certain trauma patients without consent would expose Northfield to ethical concerns by medical-ethicists and regulators, and (f) that as a result, Northfield's future guidance was materially misstated during the Class Period.

## JURISDICTION AND VENUE

9.      The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa and 28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein occurred in substantial part in this District. In addition, the Company maintains its headquarters in this District at 1560 Sherman Avenue, Suite 1000, Evanston, Illinois 60201-4800.

12.     In connection with the acts, transactions and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

13.     Plaintiff, Jonathan D. Meyers, purchased Northfield shares during the Class Period, as evidenced by the attached certification, and has suffered damages.

14.     Defendant, Northfield Laboratories, Inc. is a development stage company that engages in the research, development, testing, manufacture, marketing, and distribution of

5

hemoglobin-based blood substitute products. It primarily develops PolyHeme, an oxygen-carrying blood substitute for the treatment of urgent life-threatening blood loss in trauma and resultant surgical settings. PolyHeme is in the Phase III clinical trial stage. The Company was founded in 1985 and is based in Evanston, Illinois.

15.     Defendant Steven A. Gould ("Gould") is a founding member of Northfield. From July 1993 to July 2002, Gould served as President and a director of Northfield. Gould was the CEO and Chairman of Northfield from July 2002 through the end of the Class Period.

16.     Defendant Gould is referred to hereafter as the "Individual Defendant."

17.     By reason of his management position, membership on the Board, and ability to make public statements in the name of Northfield, the Individual Defendant was and/or is a controlling person, and had the power and influence to cause (and did cause) Northfield to engage in the unlawful conduct complained of herein.

18.     By reason of his position with the Company, the Individual Defendant had access to internal Northfield documents, reports and other information, including adverse non-public information concerning the Company's ANH clinical trial, financial condition, and future prospects, and attended management and/or board of directors' meetings. As a result of the foregoing, he was responsible for the truthfulness and accuracy of the Company's public filings and press releases described herein.

19.     The Individual Defendant, as an officer and/or director of a publicly-held company, had a duty to disseminate promptly, truthful and accurate information with respect to Northfield and to correct any public filings or statements issued by or on behalf of the Company that had become false or misleading.

20.     The Individual Defendant knew or recklessly disregarded that the false and/or misleading statements and omissions complained of herein would adversely affect the integrity

6

of the market for the Company's securities and would cause the price of the Company's securities to become artificially inflated. The Individual Defendant had actual knowledge of the adverse results in the Company's ANH clinical trial and failed to disclose such material facts thereby misleading the investing public. The Individual Defendant acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

21. The Individual Defendant is a direct participant in, and co-conspirator of, the wrongs complained of herein. The Individual Defendant, because of his positions with Northfield, was responsible for Northfield's statements and reports concerning PolyHeme's progress from its earliest stages and were provided with copies of the Northfield's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendant is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

22. During the Class Period, defendants publicly represented that PolyHeme was a blood substitute with a clean safety profile that did not demonstrate any serious adverse reactions, side effects or patient deaths. The false and misleading picture of the safety profile of PolyHeme has contributed to the Company's ability to begin and continue to conduct the current Phase III clinical trial of PolyHeme for trauma, which defendants touted as "the first U.S. trial of a hemoglobin-based oxygen carrying resuscitative fluid [artificial blood] in which treatment begins the pre-hospital setting and continues during transport and in the early hospital period." This Phase III clinical trial began enrolling patients in December 2003 (the "Phase III urban ambulance trauma trial") having enrolled approximately 600 patients, of which one-half have

7

been given PolyHeme. Defendants were and are attempting to obtain approval from the FDA for PolyHeme without having publicly disclosed during the Class Period the serious adverse effects and safety data known to them as the result of the ANH clinical trial. Defendants' failure to disclose the adverse material facts and data from the ANH clinical trial enabled Northfield to deceive investors and raise tens of millions of dollars in cash in offerings of common stock to continue its operations. Northfield raised more than $15 million in a February 2004 public offering of stock and more than $77 million in a public offering of stock pursuant to a February 2005 prospectus, with the Northfield common stock priced at $15 per share. In addition, Northfield raised $23.4 million in a financing in May 2004, and $1.4 million in a funding in August 2004.

## The ANH Clinical Trial

23. On August 28, 2001, Northfield announced that it applied for FDA clearance to sell PolyHeme, in the treatment of life-threatening blood loss. As later reported in the February 22, 2006 *WSJ* article, Northfield had tried a "long-odds maneuver". Northfield "asked the FDA to approve PolyHeme based on earlier research on hospital trauma patients. In that research, PolyHeme was not compared with a control group receiving standard therapy. Instead, Northfield compared the results with other hospitals' historical experience with patients who needed blood but didn't get any. These patients were Jehovah's witnesses who declined blood for religious reasons."

24. On November 19, 2001, Northfield announced via press release that the FDA issued a refusal-to-file letter refusing to accept its initial application to market PolyHeme. Northfield stated that it would move quickly to address the questions raised by the FDA. According to Northfield, the FDA cited concerns about the validity of the comparison and indicated that it is seeking additional information before accepting the application for filing.

8

25.    On November 19, 2001, *The Street.com* published an article entitled:  "FDA rejects Northfield's Application for a Blood Substitute".  According to the article, Northfield did not address what questions or issues were raised by the FDA and did not indicate whether new clinical trials would be necessary.  *The Street.com* stated that, "But the absence of detail about the clinical testing of PolyHeme has become sort of a trademark for the company which rarely communicates with the media, investors or Wall Street analysts."

26.    On July 24, 2002, Northfield announced the resignation of Richard DeWoskin, a company founder, as the Company's Chairman and CEO.  Defendant Gould, also a founder of the Company, and its president, was named Chairman and CEO.  Defendant Gould addressed Northfield's ongoing efforts to win approval from the FDA for the Company's biologics license application ("BLA") for PolyHeme, saying that Northfield plans to effectively address the FDA's concerns and that it believes there will be a "successful conclusion" to the process.

27.    On July 26, 2002, *the Street.com* published an article entitled: "Northfield CEO: PolyHeme May Need More Trials."  According to the article, the Company's "silence hasn't been golden" and that since November 2001 "Northfield executives have said almost nothing about the nature of the FDA's concerns, nor have they offered much insight into what's needed to get PolyHeme back on track."  The article continued in relevant part:

> In an interview with the *TheStreet.com*, Gould said he hopes to immediately improve the way the company communicates with shareholders. Front and center on their minds, of course, is just what is going on with PolyHeme.
>
> "We've been engaged in a dialogue with the FDA [regarding PolyHeme], and I think we've made progress," he says. "Certainly, there is the possibility that we will need to do additional trials – I can't sit here and tell you otherwise. But we don't know that definitively at this point. We hope, as soon as possible, to wrap up our FDA discussions and be in a position to make an announcement."
>
> The negotiations with the FDA are centered on some key areas, says Gould. First, regulators want Northfield to be more specific about just how its blood substitute would be used. Northfield is seeking approval of PolyHeme for use in

9

trauma situations where patients face life-threatening blood loss and do not have access to regular blood.

"The FDA is always concerned about off-label use of any approved product," says Gould. "We've been explaining to them in much greater detail exactly what kind of patient and in what setting PolyHeme would be used in. We want to be as precise as possible, and we don't want the FDA to think we're trying to use a back door to get PolyHeme used on a wider basis."

**The Company's Trials**

Of course, discussions about PolyHeme's use are moot if the blood substitute never makes it to market. This is where the risk of a new clinical trial enters. Northfield has not submitted a randomized or controlled study of PolyHeme to the FDA. Instead, all patients in Northfield's study were given PolyHeme, then their results were compared to published, historical reports results of patients in similar situations.

\*\*\*

No mention was made of the safety problems which arose in that trial.

28.     The article continued with Gould's description of where he saw the PolyHeme

application process headed:

\*\*\*

Gould, in his new role as CEO, says his priorities, in addition to dealing with the FDA, will be to raise additional capital and secure a partnership with a major pharmaceutical company. But these goals won't be met until the FDA situation is hammered out, he says.

"We need some more certainty. I have a sense of urgency, because when the market does allow it, I want to be in a position where we can raise some money," he says. "The same goes with partnerships. We always have interested, potential partners, but in order to move forward they need to know where we stand and what challenges we face. This has to be resolved before we move forward."

So, when will this happen?

"I really don't know when the FDA discussions will be completed, but trust me, no one wants that to happen faster than me," he says. "What I want to do is provide information whenever there is progress, or lack of progress."

At this point, investors seem to be shrugging off the risks of a lengthy delay in PolyHeme's development, and are instead happy with the management changes and promises of more openness about the company's operations. Northfield

shares closed higher Wednesday, after the announcement was made, and Thursday, the stock continued to climb, closing up 64 cents, or 1/3%, to $5.43 per share.

29.     Northfield discussed its prior clinical trials in the Company's 2002 Form 10-K dated August 9, 2002 "2002 10K", stating:

> We have conducted clinical trials of PolyHeme at multiple locations in the United States. Our clinical trials included infusion of PolyHeme in trauma and emergency surgical applications, in elective surgical procedures, and as life-saving therapy in situations of compassionate use. The observations in these trials have demonstrated the potential clinical utility of PolyHeme in treatment of urgent blood loss and life threatening hemoglobin levels.

30.     The Company also noted in its 2002 10K that, "While the use of PolyHeme in our elective surgery trials was the same as that for trauma -- high dose, rapid infusion for acute blood loss -- the clinical endpoint for these trials was the elimination of the use of banked blood. Due to the complexity of the clinical protocol, however, patient accrual progressed slowly. As a result, we closed the elective surgery protocol after our BLA was submitted."

## Northfield's Development of PolyHeme Treatment IND

31.     On October 4, 2002, Northfield announced the Company's collaboration with the U.S. Army on PolyHeme in developing a treatment IND for battlefield use. A treatment IND is typically submitted for experimental drugs showing promise in clinical testing for serious or life threatening conditions while the final clinical work is conducted and the FDA review takes place.

32.     The October 4, 2002 press release discussed a clinical trial the results of which were originally published in October 2001 and re-published in the October 2002 issue of the Journal of the American College of Surgeons. It was a trial, in the hospital setting, that involved the infusion of human polymerized hemoglobin in 171 volume-depleted trauma patients that reduced mortality to 10.5 percent from a rate of 16 percent in historical controls. In that trial,

11

Northfield compared the outcome in the 171 trauma patients to historical data from 300 surgical patients who refused transfusion. The press release continued in relevant part:

> "The observations in our trauma trial, published in the October issue of the Journal of the American College of Surgeons, document remarkable survival rates in patients with massive blood loss and provided the impetus for this unique collaboration with the Army," commented Steven A. Gould, M.D., Chairman and Chief Executive Officer of Northfield.
>
> The publication provides the details regarding the 171 patients who received rapid infusions of 1 to 20 units of PolyHeme in lieu of red cells as the initial oxygen-carrying replacement in trauma and urgent surgery. The study compared the outcome in patients receiving PolyHeme to historical data on bleeding patients with comparable blood loss who refused blood due to religious objections. The survival rate in the patients receiving PolyHeme at the lowest observed hemoglobin levels who had essentially no remaining red cells in their circulation was 75%. The historical data report no patient survival at these grave levels. These results document a compelling clinical benefit, and confirm PolyHeme's life-sustaining capacity in massive blood loss situations when blood may be unavailable.
>
> "This is a gratifying situation," added Dr. Gould. "We have been in conversations with the U. S. Army for many years, but the dialogue has accelerated rather dramatically with the situation in Afghanistan. Our study design provided a unique opportunity to assess the ability of PolyHeme to treat urgently bleeding patients in the virtual absence of any circulating red cells. It represents the most stringent set of experimental conditions but also reflects the manner in which PolyHeme is likely to be used. Based on the study and the important observed benefits of our product, we believe PolyHeme resolves any concerns about the unavailability of blood in the civilian or military setting, and should therefore be particularly useful in the treatment of urgent blood loss. We are delighted to reach this stage of joint development with the U.S. Army."

33.     On November 11, 2002, Northfield issued a press release stating that the FDA had asked for additional information regarding PolyHeme. Other FDA requests related to the collection and monitoring of clinical data to ensure maximum safety of the enrolled patients.

34.     In the Company's Form 10-Q for the quarter ended February 28, 2003, FDA approved of a new PolyHeme clinical trial was noted:

> On March 5, 2003, we announced that we had received clearance from the Food and Drug Administration to proceed with a pivotal Phase III trial in which PolyHeme will be used for the first time in civilian trauma applications to treat

severely injured patients before they reach the hospital. Under this protocol, treatment with PolyHeme will begin at the scene of the injury and continue during transport to the hospital by either ground or air ambulance.

* * *

We have also submitted a request for Special Protocol Assessment ("SPA") for our approved civilian trauma trials. SPA represents an acknowledgment and confirmation of a mutual agreement between the sponsoring company and FDA that successful completion of a clinical trial will form the basis for product approval. If agreement is reached, FDA reduces the agreement to writing and makes it part of the administrative record.

35. On June 12, 2003, in a release issued by Reuters, it was disclosed that Northfield

reached a special agreement with the FDA:

NEW YORK, June 12 (Reuters) - Northfield Laboratories Inc. (Nasdaq: NFLD - news - people) shares rose 17 percent on Thursday after the company said it reached a special agreement with U.S. regulators ahead of a key late-stage trial of its oxygen-carrying blood substitute.

The so-called Special Protocol Assessment (SPA) is akin to an upfront contract with the U.S. Food and Drug Administration that agrees results of the phase 3 trial of Northfield's PolyHeme blood substitute, if deemed successful, will count as its efficacy claim and form the basis for approval without need for further trials.

The FDA approved Northfield's trial plan in March, but "this agreement brings an element of certainty and predictability in the regulatory process," said Northfield Chairman and Chief Executive Steven Gould.

Northfield, based in Evanston, Illinois, is hoping PolyHeme will be the first blood substitute approved by the FDA.

The trial of 720 patients is designed to assess safety and effectiveness of PolyHeme in improving survival when used to treat severely bleeding trauma patients at the scene of the injury and during transport to hospital.

The current standard treatment for traumatic blood loss prior to reaching the hospital is saline solution.

Northfield said it is still seeking some funding for the key trial. The SPA could prove helpful in securing that financing, as well as money being poured into Northfield's stock on Thursday.

36.     On this news, Northfield's stock traded significantly up having reached a high of $9.95 a share and closing at $8.85 a share, representing a $2 a share increase in stock price over the prior two days' trading days.

37.     On July 29, 2003, Northfield announced the closing of a financing that raised $10.6 million in a registered offering of common stock. The terms of the transaction included the option to raise an additional $3.18 million within 60 days after completion of the initial share purchase. Northfield stated that it intends to use the proceeds to support its pivotal Phase III pre-hospital trial of PolyHeme.

## The PHASE III Urban Ambulance Trauma Trial

38.     On December 22, 2003, Northfield announced via press release that the Company had commenced enrolling patients in its Phase III urban ambulance trauma trial, starting in the pre-hospital setting, involving ambulances and trauma centers rather than operating rooms. The release stated in relevant part:

> "I am gratified to report that Northfield has received notification of the first full approval by an Institutional Review Board (IRB) to proceed with patient enrollment in this trial," said Steven A. Gould, M.D., Chairman and Chief Executive Officer. "This is a key accomplishment for Northfield, attributable to the diligence and perseverance of the many individuals involved in the challenge of embarking on such a complex trial. We anticipate multiple other final IRB approvals in the near future.

> "We have scheduled a site initiation visit prior to the end of this month and patient enrollment will begin immediately thereafter," said Dr. Gould.

> The PolyHeme(R) urban ambulance trial is a controlled study designed to evaluate the safety and efficacy of PolyHeme(R) in treating severely injured and bleeding patients when blood is not immediately available. Patients meeting the eligibility criteria will be randomly assigned to receive infusions of either PolyHeme(R) or the current standard treatment, a saline solution. Treatment will begin before arrival at the hospital, either at the scene of the injury or in the ambulance, and continue during a 12-hour post injury period in the hospital. The study will enroll 720 patients and will be conducted at approximately 20 Level I trauma centers across the United States.

14

In this trial it may not be possible to obtain informed consent from the patient or a legally authorized representative due to the urgency of the situation and the extent of the injuries. The study is therefore being conducted under a federal regulation that allows research to be conducted in certain emergent, life-threatening situations using an exception from the requirement for informed consent. Authorization to proceed with patient enrollment under this regulation signifies that the IRB has completed its oversight and evaluation of the public disclosure and community consultation process that is required, as well as its comprehensive review of the study protocol.

39.     On January 30, 2004, Northfield announced via press release the closing of a

financing that raised $15 million in a registered offering of 2,585,965 shares of common stock.

Investors had the option to purchase up to an additional $3.75 million of common stock under

similar terms and conditions within 90 days after completion of the initial share purchase.

40.     On February 20, 2004, the *Associated Press* published an article regarding

Northfield's PolyHeme clinical trial entitled: "Artificial blood tested without consent." The

article stated in relevant part:

CHICAGO -- Paramedics are testing an experimental blood substitute on severely injured patients without their consent in an unusual study under way or proposed at 20 hospitals around the country.

The study was launched last month in Denver and follows similar research that was halted in 1998, when more than 20 patients died after getting a different [Baxter Healthcare] experimental blood substitute.

Supporters say the current product, PolyHeme, made by Northfield Laboratories of Evanston, Ill., is safer and could save many of the nearly 100,000 people who die of bleeding injuries each year nationwide.

"It could revolutionize how we take care of resuscitation in the United States and across the world," said lead investigator Dr. Ernest Moore, chief of trauma surgery at Denver Health Medical Center.

\* \* \*

Patients will be randomly selected to receive PolyHeme intravenously or standard saline solution at the scene or en route to the hospital.

\* \* \*

15

The centers where the PolyHeme study is under way or proposed include the University of Texas Medical School in Houston; Loyola University Medical Center in Maywood, Ill.; Mayo Clinic in Rochester, Minn.; and Regional Medical Center in Memphis, Tenn. Northfield Laboratories would not disclose the names of the other participating hospitals.

* * *

The article went on to say that:

Earlier PolyHeme studies showed it was safe in hospitalized patients and could be used to temporarily replace a patient's entire blood....

In severely bleeding patients, replacing blood volume quickly is critical to survival.

* * *

The blood substitute safely dissipates in the body after about 24 hours, the company said.

In the two trading days following publication of this article, Northfield's stock price rose

more than $2.00 per share on heavier than usual trading volume.

41. On March 24, 2004, *the Street.com* published an article entitled: "Quest for

Blood Substitute a Costly One for Investors." The article stated, in relevant part:

Meanwhile, Northfield has been conducting presentations at investor forums, describing the progress of enrolling patients in the crucial research trial that could lead to the company seeking FDA approval for its blood substitute called PolyHeme.

Northfield has finessed its presentations, declining to give precise estimates on when all of the research sites will be in force or when it will make its pitch to the FDA. The company started enrolling patients in December in its phase III clinical trial, an unusual test involving ambulances and trauma centers rather than operating rooms.

In recent presentations to investors, Northfield's chairman, Dr. Steven A. Gould, has said a best-case scenario would be for the clinical trials – involving 720 patients at 20 sites – to be completed in 12 months. The company's analysis of the data and the FDA's review of that data might take another 12 months, he said. Gould won't identify the handful of active sites (even though local media have written stories about the tests), won't comment on negotiations for new sites and upcoming tests, and won't discuss how patient enrollment is proceeding at the

active research sites.

42.     On April 14, 2004, Northfield provided an update on the status of its pivotal phase III urban ambulance trauma trial. The Company stated that there are 22 institutions that have publicly disclosed their intention to participate in the study. Defendant Gould stated that "we are delighted that patient enrollment in this groundbreaking study is underway, and we continue to be gratified by the number of investigators, institutions, and communities which have expressed an interest in participating in this trial."

43.     On May 19, 2004, Northfield announced the closing of a financing that raised $23.4 million in a registered offering of approximately 1.95 million shares of common stock.

44.     On July 21, 2004, Northfield announced via press release that the phase III urban ambulance trauma trial had passed the first interim analysis of data on mortality and serious adverse events. The IDMC had recommended that the Company's pivotal phase III study with PolyHeme continue without modification. Defendant Gould noted, in relevant part, that "this is a significant accomplishment for Northfield. The recommendation of the IDMC is a validation of the diligence and concern for patient safety that has characterized this complex study from its inception."

45.     In its Form 10-K for fiscal year ended May 31, 2004 ("2004 10K") Northfield described its prior clinical trials:

> We have previously conducted Phase II and Phase III clinical trials of PolyHeme at multiple locations in the United States in trauma and emergency surgical applications, in elective surgical procedures, and in situations of compassionate use in life-threatening situations. The observations in these trials have indicated the potential clinical utility of PolyHeme in the treatment of urgent blood loss and life-threatening hemoglobin levels. In a trials of hospitalized trauma patients, an analysis of the data revealed that PolyHeme significantly improved survival compared to historical control patients who did not receive blood.

\* \* \*

17

> While the use of PolyHeme in our elective surgery trials was the same as that for trauma – high dose, rapid infusion for acute blood loss – the clinical endpoint for these trials was the elimination of the use of banked blood. Due to the complexity of the clinical protocol, however, patient accrual progressed slowly. As a result, we closed the elective surgery protocol after our BLA was submitted in August 2001.

46.     On December 23, 2004, Northfield filed a $100 million shelf registration statement with the SEC.

47.     On February 9, 2005, Northfield announced the completion of its previously announced offering of 4.5 million shares of common stock and the over-allotment option of 675,000 additional shares. The completed offering of 5.175 million shares of common stock resulted in gross proceeds to Northfield of $77.6 million.

48.     On April 11, 2005, Northfield announced via press release that the IDMC had recommended that the Company's pivotal phase III trial with PolyHeme continue without modification following the third planned interim analysis of the study data. The IDMC reviewed blinded data on mortality in the first 250 patients enrolled in the study.

49.     On this news, Northfield stock closed up $3.78 a share to $15.75 a share.

50.     On June 28, 2005, UBS initiated coverage of the Company with a buy rating and a $17 price target stating that PolyHeme could be the first hemoglobin-based oxygen carrier to gain approval from the FDA. UBS forecasted FDA approval in mid-2007 and that Northfield should generate revenue of $173 million by 2011.

51.     On August 15, 2005, Northfield filed its annual report on a Form 10-K with the SEC for the 12 months ended May 31, 2005 (the "2005 10K"). The 2005 10K was signed by Defendant Gould, who also signed the required Sarbanes-Oxley certification. The 2005 10K stated in relevant part:

> "Our current trial is based on our experience in prior clinical trials documenting the potential life-sustaining capability of PolyHeme

18

when given in rapid, massive infusions to critically injured patients in the hospital...

As part of our trial protocol, an Independent Data Monitoring Committee... is responsible for periodically evaluating the safety data from the trial and making recommendations relating to continuation or modification of the trial protocol to minimize identified risks to patients...[It] has completed the first three of four planned reviews of data...and has recommended on each occasion that the trial continue without modification...We believe that PolyHeme ultimately represents a substantial global market opportunity...

Our scientific research term has been responsible for the original concept, the early development and evaluation and clinical testing of PolyHeme, and has authored over 100 publications in the scientific literature...[there must be] scientific evidence of to assess the safety and effectiveness of alternative treatment [that is, use of PolyHeme in the pivotal Phase III trial]...Before enrollment can begin [in the current pivotal Phase III trial] the regulation requires public disclosure of information about the trial, including the potential risks and benefits..."

52.     Significantly, for its pivotal Phase III clinical trial, the 2005 10K noted the

importance of the safety data and mortality rate:

Evaluation of the efficacy data generated in our pivotal Phase III trial will focus on patient survival at 30 days after the date of injury. The mortality rate observed for patients in the treatment group in our trial will be compared statistically with the mortality rate for patients in the control group.

53.     On January 3, 2006, Northfield announced that it will receive $3.5 million in

designated funding for the continued development of PolyHeme, as part of the fiscal 2006

Defense Appropriations Bill.

54.     On January 9, 2006, Northfield filed a Form 10-Q for the period ended November

30, 2005 with the SEC, ("The January 2006 10-Q"). In the January 2006 10-Q, Northfield

described PolyHeme and the ongoing Phase III trauma clinical trial, including the safety data

from the ongoing pivotal Phase III trauma trial and made the statement that the Data Monitoring

Committee had not made any recommendations to modify the current clinical trial based on

19

safety data. Similar statements were made by defendants in Northfield's SEC Forms 10-Q, filed on April 11, 2005, January 10, 2005, October 12, 2004, and April 14, 2004.

## Disclosure of Serious Adverse Events in the ANH Clinical Trial

55.     On February 22, 2006, *The WSJ* published an article describing the ANH clinical trial that Northfield had terminated in 2001. The article was entitled: "Amid Alarm Bells, A Blood Substitute Keeps Pumping. Ten in Trial Have Heart Attacks, But Data aren't published; FDA allows a New Study, Doctor's Pleas are Ignored." The WSJ reported that ten of 81 patients who received PolyHeme in the ANH clinical trial suffered a heart attack within seven days, and two of those died. None of the 71 patients in the ANH clinical trial who received real blood were found to have suffered a heart attack. In the aftermath of receiving this data as reported by the WSJ, defendants shut down the ANH clinical trial and kept this highly adverse data hidden from the public.

56.     In its response to the February 22, 2006 *WSJ* article, defendants issued a press release that did not dispute the data concerning the ANH clinical trial's adverse results or that they did not publish the full data upon the closing of the ANH clinical trial. Defendants admitted that they did not publish the data concerning the adverse cardiac results, and defendant Gould attempted to downplay the serious adverse events that had occurred in that study, by stating "[w]e believe that publishing the full data upon closing the study, would have shown that PolyHeme could not be isolated as the cause of the observed serious adverse events." Nonetheless, the adverse events were concealed from investors for over four years and the market was not provided with a fair opportunity to determine the level of risk involved in obtaining FDA approval for this product. Nor were patients or clinicians in the subsequent urban ambulance trials provided with this safety information to determine whether they wished to participate in the study.

20

57. Also on February 22, 2006, Northfield's stock fell as low as $8.86 a share; closing around $11.64 a share on over 4.1 million shares traded.

58. On February 23, 2006, after the markets closed, Reuters published an article entitled: "U.S. Senator Questions FDA-Approved Blood Study." The article continued in relevant part:

> WASHINGTON, Feb 23 (Reuters) - A key Senate Republican pressed the U.S. Food and Drug Administration on Thursday for details on its role in the clinical trial of an experimental blood substitute being tested on trauma patients in 18 states, in some cases without their consent.
>
> Senate Finance Committee Chairman Chuck Grassley asked the FDA to make a full public disclosure about the clinical trial of Northfield Laboratories Inc.'s (NFLD.O) PolyHeme blood substitute, after its safety was called into question in a Wall Street Journal article.
>
> "It is outrageous that, for all intents and purposes, the FDA allowed a clinical trial to proceed, which makes every citizen in the United States a potential 'guinea pig' without providing a practical, informative warning to the public," the Iowa Republican said in a letter to acting FDA Commissioner Andrew von Eschenbach.
>
> The Wall Street Journal reported on Wednesday that Evanston, Illinois-based Northfield was conducting the trial under a rarely used FDA regulation allowing waivers of the informed consent typically required in clinical trials -- provided the trial is accompanied by a community outreach program.
>
> The article described a previous clinical trial of PolyHeme, in which about 12 percent of patients on the product suffered heart attacks and two out of 81 patients died. The trial results were not published, the newspaper said.
>
> Northfield said on Wednesday it had disclosed full data from that trial, which closed in 2000, to the FDA. The company said publishing the data would have shown PolyHeme could not be isolated as the cause of the serious adverse events that were observed.
>
> Last April, the company said an independent safety panel gave the green light for its late-stage testing to continue, after a review of death rates in the study.
>
> In his letter to the FDA, Grassley expressed concern that patients could be subjected to the experimental blood product unless they were wearing a wristband that says they decline to participate in the study.
>
> Many people probably do not know how to get the wristband, he added.

"Why should Americans have to wear a bracelet at all times to protect themselves from a government-sanctioned medical experiment if they happen to get into a car accident?," Grassley asked in a statement releasing the text of his letter.

Grassley asked the FDA to provide his committee with a detailed briefing on the PolyHeme study no later than March 8. His panel has oversight of the Medicare and Medicaid programs, which pays for drugs and other FDA-approved products used by old, disabled or poor beneficiaries.

An FDA spokesman did not immediately respond to an e-mail request for comment.

59.     In reaction to the increased scrutiny by Grassley, on February 24, 2006,

Northfield stock closed down at $10.54 a share on over 1.4 million shares traded.

60.     In an article by The Associated Press Medical Writer, Lindsay Tanner, dated

March 2, 2006, it was noted that certain medical ethicists have strongly questioned Northfield's

PolyHeme trials. The article stated in relevant part:

Imagine being in a car crash, lying unconscious and bleeding in an ambulance. With no blood on board, paramedics give you an experimental substitute, but even at the hospital, you get fake blood for several hours before doctors try the real thing.

Medical ethicists say a study that is doing just that on hundreds of trauma patients without their consent should be halted.

It's a renewed attack on research that began in 2004 after Northfield Laboratories got federal approval for its study of the blood substitute PolyHeme.

Debate was reignited by a Wall Street Journal story last week that suggested the company tried to hide some crucial details about another blood substitute study back in 2000. The Journal reported that 10 heart surgery patients in that PolyHeme experiment had heart attacks, while other patients given real blood did not.

The Evanston, Ill.-based company halted that study and hasn't published the full results, but Northfield Chairman Dr. Steven Gould says there were no attempts at secrecy.

Gould said Tuesday that PolyHeme didn't cause the heart attacks or disproportionately more deaths. He said the study was stopped, not for safety concerns, but because enrollment was declining and the company wanted to focus on trauma research.

The current study should never have begun, said Nancy M.P. King, a University of North Carolina ethicist who co-authored articles for an ethics journal. She and colleagues wrote that real blood shouldn't be withheld from people who need it without their consent.

"There is a serious ethical flaw in this complicated and novel study," says the article to appear next week on the Web site of the American Journal of Bioethics.

\*\*\*

Some hospitalized patients inevitably will die because of their injuries, but they will have died "while being denied an available treatment (blood transfusions)," the authors wrote.

61.     The article described Northfield's failure to advise potential patients of the adverse consequences of the ongoing clinical trial:

The trauma study was approved under a federal "informed consent" exemption that applies to emergency research. It requires community briefings in which residents can opt out -- in this case by getting plastic hospital-style bracelets in case they are injured and unconscious.

But King says community briefings have not made it clear that patients will get experimental treatment and not blood transfusions for several hours even while in the hospital. Many briefings also did not mention the previous PolyHeme study, and withholding that information was unethical, the ethicists said.

King noted that in January, Northfield sued to keep a weekly San Diego newspaper from publishing information about the trauma study, arguing that publication would unfairly reveal trade secrets.

"So much about this trial is secret because the FDA doesn't release information to the public about products that are being developed by commercial sponsors," King said.

Gould dismissed concerns about ethics and secrecy and said periodic reviews by an independent monitor have deemed the trauma study fit to proceed.

62.     On March 13, 2006, The WSJ published an article entitled: "FDA Laxity Alleged in Blood Substitute Study." The article highlighted Grassley's concerns that those patients receiving PolyHeme may be "potential guinea pigs" who may not be fully aware of the risks and benefits of the blood substitute.

63.     On March 16, 2006, it was disclosed that the SEC had begun an investigation into the Company. Northfield stated that it had "received an informal request to voluntarily provide

certain information" to the staff of the SEC's office in Chicago. The Company did not disclose

what the SEC was investigating.

64.     On March 17, 2006, *the WSJ* published an article entitled: "SEC Begins Probe of

Northfield Labs Over Blood Studies." The article stated in relevant part:

> The Securities and Exchange Commission has begun an investigation into
> Northfield Laboratories Inc. and the way the Illinois company has conducted and
> reported clinical studies of its blood substitute PolyHeme.
>
> Northfield, Evanston, Ill., last night disclosed it had "received an informal request
> to voluntarily provide certain information" to the staff of the SEC's office in
> Chicago. The company didn't say precisely what the SEC was investigating --
> noting only that the SEC sought information related to the clinical development of
> PolyHeme for elective surgery -- but pledged it "intends to respond to the
> request." The SEC hasn't responded to requests to comment.
>
> ***
>
> The newer study, begun in December 2003, is taking place in trauma patients at
> 31 hospitals in 18 states and is targeted to enroll 720 patients. Half are to receive
> the blood substitute, while the other half get standard therapy -- saline solution in
> the ambulance and donor blood in the hospital. Results are expected later this
> year.
>
> During the earlier surgery study, Northfield consistently expressed optimism
> about PolyHeme. An August 1999 news release spoke of PolyHeme's "excellent
> safety profile." A release in April 2000 said its surgery study was "producing very
> important results." The company explained in an SEC filing that it shut down the
> surgery study in 2001 because it was taking too long to complete.
>
> One prominent doctor who participated in the earlier surgery study, Ronald M.
> Fairman of the University of Pennsylvania, said he repeatedly urged Northfield to
> publish the full results from that surgery study but the company wouldn't do so.
> In a statement in February, the company said, "In retrospect, reporting the full
> study results earlier would have been better."

65.     The defendants were motivated to not fully disclose the adverse results of its

ANH clinical trial which was eventually shut down in 2001 in order to (i) facilitate the

acceptance of local communities and universities to conduct and allow subsequent clinical trials

to proceed; (ii) to persuade clinicians and prospective patients to participate in the pivotal Phase

III clinical study because there had been no serious adverse events in prior clinical trials; and (iii)

continue and enhance the illusion that PolyHeme was a blood substitute with a clean safety profile in order to generate tens of millions of dollars through offerings of Northfield common stock.

66. The statements contained in ¶¶ 40, 41, 42, 44, 45, 48, 51, 52 and 54 were materially false and misleading when made because defendants failed to disclose or indicate that: (a) the Company's ANH clinical trial was abruptly ended due to serious adverse events involving heart attacks and deaths of patients receiving PolyHeme in the study; (b) the Company's potential earnings from PolyHeme had been overstated because of the lack of full disclosure as to the Company's ANH clinical trial's adverse results; (c) defendants had issued false and misleading statements to investors as to the progress of, marketability and ultimate success of PolyHeme; (d) the adverse results of the Company's ANH clinical trial for PolyHeme would subject Northfield to increased regulatory scrutiny and greater risk that the FDA might not approve PolyHeme for marketing; (e) the structure of the Company's PolyHeme drug trials whereby PolyHeme may be tested on certain trauma patients without consent would expose Northfield to ethical concerns by medical-ethicists and regulators, and (f) that as a result, Northfield's future guidance was materially misstated during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

67.     During the Class Period, defendants engaged in a course of conduct that artificially inflated the Company's common stock and operated as a fraud or deceit on purchasers of Northfield's common stock.     The price of Northfield's common stock fell when the misrepresentations made to the investing community, including the disclosure of materially false and misleading statements related to certain PolyHeme drug trials, and/or the information alleged herein, were finally disclosed to investors. As a result, plaintiff and other members of the class suffered damages.

## FRAUD ON THE MARKET ALLEGATIONS

68.     The market for Northfield's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Northfield's common stock traded at artificially inflated prices during the Class Period.     Plaintiff and other members of the Class purchased or otherwise acquired Northfield's common stock relying upon the integrity of the market price of Northfield's common stock and market information relating to Northfield's common stock, and have been damaged thereby.

69.     During the Class Period, the defendants materially misled the investing public, thereby inflating the price of Northfield's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, finances and operations.

70.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Northfield's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Northfield and its business and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the true facts were disclosed to the market.

## SCIENTER

71. The facts alleged herein, compel a strong inference that the Defendants made material false and misleading statements to the investing public with scienter in that the Defendants knew that the public statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In particular, among other things, defendants had actual knowledge of the serious adverse events, including deaths in the ANH clinical trial, and concealed such information from the investing public.

72. The Individual Defendant engaged in such a scheme order to: (i) protect and enhance his executive position and the substantial compensation and prestige obtained thereby; (ii) enhance the value of his personal holdings of Northfield's shares; and (iii) allow the Company to generate tens of millions of dollars in direct offerings of common stock.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired Northfield's common stock during the Class Period, a period previously defined as February 20, 2004 through and including February 21, 2006. Excluded are the defendants, any entity in which the defendants have a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of defendants.

74.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are thousands of members of the Class who purchased Northfield's common stock during the Class Period.

75.     Questions of law and fact are common to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b)     whether the Company issued false and misleading statements during the Class Period;
>
> (c)     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
>
> (d)     whether the market prices of the Company's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(e)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

76.     Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

78.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

79.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on the market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     such omissions and misrepresentations were material;

(c)     the Company's shares traded in an efficient market and its price was inflated artificially during the Class Period because of defendants' misrepresentations and omissions detailed herein;

(d)     the misrepresentations and omissions alleged induced a reasonable investor to misjudge the value of the Company's shares; and

(e)     Plaintiff and the other members of the Class purchased Northfield's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

80.     Based upon the factors set forth in the preceding paragraph, plaintiff and the other members of the Class are entitled to the presumption of reliance upon the integrity of the market.

### NO STATUTORY SAFE HARBOR

81.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded herein are "forward-looking" statements nor were they identified as "forward-looking statements" when made.   Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward looking statements.   In the alternative, to the extent that the statutory safe harbor does apply to any statements pleaded herein that are deemed to be forward-looking, defendants are liable for those false forward-looking statements because at the time each of those statements was made the speaker knew those forward-looking statement were false and/or the statement was authorized and/or approved by an executive officer of Northfield who knew that the statements were false when made.

### FIRST CLAIM FOR RELIEF
### (VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 BROUGHT AGAINST ALL DEFENDANTS)

82.     Plaintiff repeats and reiterates each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.     During the Class Period, defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which it knowingly or recklessly engaged in acts,

transactions, practices, and courses of business that operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to deceive the investing public, including plaintiff and the other members of the Class, and to induce plaintiff and the other members of the Class to purchase Northfield's common stock during the Class Period at artificially inflated prices.

84.     During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued, participated in the issuance of, the preparation and/or issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

85.     As a result of defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market price of Northfield's common stock was artificially inflated during the Class Period. Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the shares in purchasing Northfield's common stock. Had plaintiff and the other members of the Class known the truth, they would not have purchased Northfield common stock or would not have purchased shares at the inflated prices that they did.

86.     Plaintiff and the other members of the Class have suffered damages as a result of the wrongs herein alleged in an amount to be proved at trial.

87.     By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and is liable to plaintiff and the other

members of the Class for damages which they suffered in connection with their purchases of Northfield's shares the Class Period.

## SECOND CLAIM FOR RELIEF
### (VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT BROUGHT AGAINST THE INDIVIDUAL DEFENDANT)

88.     Plaintiff repeats and reiterates each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

89.     The Individual Defendant acted as a controlling person of the Company under the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions, and active participation in and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the Company's business plans and implementation thereof, the Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff alleges are false and misleading. The Individual Defendant was provided with, or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In particular, the Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

91.     By virtue of his positions as a controlling person, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the

wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)     Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)     Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 30, 2006

Respectfully submitted,

**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP**

By: _____

Patrick V. Dahlstrom
Leigh R. Smollar
1 North LaSalle Street
Chicago, Illinois 60602-3908
Tel.: (312) 377-1181
Fax.: (312) 377-1184

**ZWERLING, SCHACHTER
& ZWERLING, LLP**
Jeffrey C. Zwerling
Richard A. Speirs
Shaye J. Fuchs
41 Madison Avenue-32nd Floor
New York, NY 10010
Tel.: (212) 223-3900
Fax: (212) 371-5969
*Attorneys for Plaintiff*

\\Zszny01\NY_Docs\NORTHFIELD LABORATORIES\Complaint.doc

34

## CERTIFICATION OF JONATHAN D. MEYERS

I, Jonathan D. Meyers, declare that:

1.     I have reviewed the complaint regarding Northfield Laboratories, Inc. and authorized its filing.

2.     I did not purchase any security, which is the subject of this action, at the direction of counsel for plaintiff or in order to participate in this private action.

3.     I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     My transactions in the security that is the subject of this action during the class period are as follows:

| Date | Security | Transaction | # Shares | Price | Total |
|------|----------|-------------|----------|-------|-------|
|      |          | See attachment A |     |       |       |

5.     During the three years prior to the date of this Certification, I sought to serve as a representative party for a class filed under the federal securities laws in *In Re Pharmos Corp. Securities Litigation*, pending in the District of New Jersey; Civ. No. 05-CV-00338 .

6.     I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I, Jonathan Meyers, declare under penalty of perjury that the foregoing is true and

correct.

March 25, 2006

_Jonathan O. Meyers_
Jonathan Meyers

Jonathan D. Meyers Certification
Attachment A

Jonathan D. Meyers – Individual

| Date[1] | Security | Transaction | # Shares | Price | Total |
|---|---|---|---|---|---|
| 12/9/04 | Common stock | Purchased | 500 | $19.39 | $9,695.00 |
| 12/9/04 | Common stock | Purchased | 500 | $19.40 | $9,700.00 |
| 12/14/04 | Common stock | Purchased | 500 | $17.93 | $8,965.00 |
| 12/14/04 | Common stock | Purchased | 1,000 | $17.93 | $17,930.00 |
| 12/16/04 | Common stock | Purchased | 500 | $19.10 | $9,550.00 |
| 12/20/04 | Common stock | Purchased | 400 | $20.94 | $8,376.00 |
| 12/20/04 | Common stock | Purchased | 500 | $20.40 | $10,200.00 |
| 12/20/04 | Common stock | Purchased | 500 | $21.31 | $10,655.00 |
| 12/20/04 | Common stock | Purchased | 500 | $21.33 | $10,665.00 |
| 12/27/04 | Common stock | Purchased | 200 | $20.40 | $4,080.00 |
| 12/27/04 | Common stock | Purchased | 200 | $20.40 | $4,080.00 |
| 12/27/04 | Common stock | Purchased | 200 | $20.45 | $4,090.00 |
| 12/27/04 | Common stock | Purchased | 400 | $20.32 | $8,128.00 |
| 12/30/04 | Common stock | Purchased | 200 | $20.25 | $4,050.00 |
| 1/5/05 | Common stock | Purchased | 200 | $23.54 | $4,708.00 |
| 1/5/05 | Common stock | Purchased | 100 | $22.25 | $2,225.00 |
| 1/5/05 | Common stock | Purchased | 100 | $22.35 | $2,235.00 |
| 2/9/05 | Common stock | Purchased | 200 | $16.25 | $3,250.00 |
| 4/15/05 | Common stock | Purchased | 200 | $15.50 | $3,100.00 |

[1] All dates refer to the settlement date.

| 6/16/05 | Common stock | Sold | 1,000 | $11.75 | $11,750.00 |
|---|---|---|---|---|---|
| 6/16/05 | Common stock | Sold | 500 | $11.80 | $5,900.00 |
| 6/16/05 | Common stock | Sold | 500 | $11.60 | $5,800.00 |
| 3/1/06 | Common stock | Sold | 1,000 | $11.20 | $11,200.00 |
| 3/1/06 | Common stock | Sold | 200 | $11.05 | $2,210.00 |
| 3/1/06 | Common stock | Sold | 100 | $11.06 | $1,106.00 |
| 3/1/06 | Common stock | Sold | 200 | $11.07 | $2,214.00 |
| 3/1/06 | Common stock | Sold | 500 | $11.02 | $5,510.00 |
| 3/1/06 | Common stock | Sold | 1,000 | $10.91 | $10,910.00 |
| 3/1/06 | Common stock | Sold | 500 | $10.91 | $5,455.00 |
| 3/1/06 | Common stock | Sold | 500 | $10.92 | $5,460.00 |
| 3/1/06 | Common stock | Sold | 500 | $10.80 | $5,400.00 |
| 3/1/06 | Common stock | Sold | 400 | $10.75 | $4,300.00 |

Jonathan Meyers – ROTH-Individual Retirement

| Settlement Date | Security | Transaction | # Shares | Price | Total |
|---|---|---|---|---|---|
| 12/23/04 | Common stock | Purchased | 600 | $20.14 | $12,084.00 |
| 1/23/06 | Common stock | Purchased | 200 | $12.70 | $2,540.00 |
| 1/23/06 | Common stock | Purchased | 800 | $12.69 | $10,152.00 |
| 3/1/06 | Common stock | Sold | 950 | $10.75 | $10,212.50 |
| 3/1/06 | Common stock | Sold | 650 | $10.74 | $6,981.00 |